**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

---

RONALD TURNER,

       Plaintiff,

    v.

JOSEPH VECCHIO, RICHARD
RODRIQUEZ, JR., MICHAEL
DONNELLY, AND CITY OF CHICAGO,

      Defendants.

Case No. 25-cv-13330

*Jury Trial Demanded.*

---

**COMPLAINT**

---

NOW COMES Plaintiff RONALD TURNER, by his attorney, LAW OFFICE OF JORDAN MARSH LLC, and complaining of the defendants, JOSEPH VECCHIO, RICHARD RODRIQUEZ, JR., MICHAEL DONNELLY, and CITY OF CHICAGO, and states the following:

**JURISDICTION AND VENUE**

1. This action arises under the Constitution of the United States, particularly the Fourth Amendment to the Constitution of the United States, under the laws of the United States, particularly the Civil Rights Act, Title 42 of the United States Code, Sections 1983 and 1988, and under the laws of the State of Illinois.

2. The jurisdiction of this Court is invoked under the provisions of Title 28 of the United States Code, 1331 and 1343. Plaintiff also invokes the supplemental jurisdiction of this Court pursuant to Title 28 of the United States Code, Section 1367.

1

3.   This Court has jurisdiction over this action pursuant to Title 28 of the United States Code §§ 1331 and 1367, as Plaintiff asserts claims under federal law and the state law claims arise out of the same facts as the Federal claims.  Venue is proper under Title 28 of the United States Code, § 1391(b)(2), as the events complained of occurred within this district.

### PARTIES

4.   At all times relevant herein, Plaintiff RONALD TURNER ("Ronald") was a resident of Chicago, Illinois.

5.   Defendants VECCHIO, RODRIQUEZ and DONNELLY ("Defendant Officers") are sued in their individual capacities and were at all times relevant, sworn tactical police officers employed by Defendant CITY OF CHICAGO, and were acting within the scope of their agency, service and/or employment with the CITY OF CHICAGO, and were acting under color of the statutes, ordinances, regulations, customs, and usages of the State of Illinois.

6.   Defendant, CITY OF CHICAGO, is a government entity operating within the State of Illinois.  The CITY OF CHICAGO is responsible for the actions of its employees while acting within the scope of their employment.  At all times relevant to this action, CITY OF CHICAGO was the employer of Defendants VECCHIO, RODRIQUEZ and DONNELLY.

### FACTUAL ALLEGATIONS

7.   On November 9, 2023, Ronald was parked in his vehicle with his one-year-old daughter, waiting for the child's mother, who was attending an appointment at Northwestern Memorial Hospital. At approximately 1:18 p.m., Defendant Officers approached the vehicle.

8.  Defendant Rodriquez stated that he stopped Ronald because the vehicle was parked in a tow zone and had a cracked windshield. Rodriquez requested Ronald's driver's license and proof of insurance.

9.  Ronald informed Rodriquez that the posted parking sign indicated he was permitted to stand for fifteen minutes if his hazard lights were activated, which they were at the time. Ronald complied with Rodriquez's request and produced his driver's license.

10. After receiving the driver's license, Rodriquez asked Ronald whether he possessed a FOID card or a concealed carry license. Ronald shook his head to indicate "no."

11. Rodriquez then asked whether the vehicle was insured. Ronald nodded "yes" and began searching his phone for proof of insurance.

12. While Ronald searched for his insurance information, Rodriquez told Defendant Vecchio, who was positioned at the passenger-side window, "There's a baby in the back there." Vecchio turned to look toward the rear of the car.

13. Ronald advised Rodriquez that he was still looking for his insurance information and Rodriquez told him to take his time.

14. Vecchio pointed to a diaper bag in the passenger seat of the car and asked, "Is this a baby bag right here?" Ronald responded, "Yes."

15. Vecchio leaned further into the car, looked closely at the bag, and again looked toward the back seat where the baby was seated.

16. Ronald reiterated that he was still searching for his insurance card, and Rodriquez again told him to take his time.

3

17. Rodriquez then took out a flashlight and appeared to shine it at the side of Roanld's door and floorboard.

18. Ronald, visibly confused, looked at Rodriquez, turned back to his phone, and muttered, "Damn." Vecchio replied, "Stay focused, man, come on." And Ronald responded, "Man, I didn't know what he was doing," while continuing to search for his proof of insurance.

19. After several seconds, Rodriquez excused himself to run Ronald's driver's license. He walked over to Defendant Donnelly, handed him the license, and mentioned the diaper bag, stating, "It's a little small to be a baby bag."

20. Vecchio remained at the passenger side of Ronald's car.

21. As soon as Rodriquez walked away, Ronald located his proof of insurance and notified the officers. Vecchio told Ronald to show it to him.

22. Vecchio reviewed Ronald's proof of insurance and confirmed it was valid.

23. Rodriquez then asked Vecchio, "That's a baby bag in there?"

24. Vecchio responded, "Yeah," and asked Ronald, "This is just formulas and stuff or what? In here?"

25. Ronald replied, "Come on, man, that's the baby bag."

26. Vecchio responded, "Baby bag? That's why I'm asking."

27. Ronald stated, "I don't know what she got in the baby bag -- that's a baby bag."

28. Vecchio then said, "Oh, he doesn't know what's in there," followed by Rodriquez asking, "You don't know what's in there?"

29. Ronald questioned why the officers were asking about the diaper bag. Rodriquez told him to calm down because they were talking to him "like men," while asking simple questions.

30. Ronald replied that he did not wish to answer further questions, explaining that he was complying with the parking sign allowing a fifteen-minute standing period, and he pointed out that the car in front of him was parked under the same conditions.

31. Vecchio responded that Ronald's car had "a few things wrong with it."

32. Ronald asked, "What does the diaper bag have to do with a few things wrong with my car?"

33. Vecchio replied, "Just asking, man."

34. Ronald stated that he did not understand why the Defendant Officers continued questioning him about the diaper bag. Rodriquez responded, "We are asking you simple direct questions."

35. Vecchio added, "You're the only one being upset."

36. Ronald said, "I'm waiting on my child's mother to come back, you ask me about her diaper bag." Vecchio replied, "Yeah," and Ronald asked, "Why?"

37. Vecchio stated, "You're in control of the vehicle." Ronald replied, "But why are you asking me about the contents of a diaper bag, like what did I do wrong for you to ask me about the contents of a diaper bag?"

38. Vecchio responded, "Why not?"

39. Rodriquez ordered Ronald to step out of his vehicle.

40. Ronald complied.

41. Defendant Officers had no reasonable suspicion or probable cause to believe Ronald had committed any crime.

42. Vecchio then opened the passenger door, stating, "Way too aggressive," and began to search the diaper bag, which contained diapers and a baby bottle. Finding nothing, Vecchio

proceeded to search under the driver seat and the center console. After finding nothing, Vecchio returned to the passenger side where Ronald, Rodriquez, Donnelly were standing and stated, "You can see the weed, man, in there."

43. Ronald, visibly upset, continued to question why the officers had illegally stopped and searched his vehicle. Rodriquez then stated for the first time that there was "cannabis coming from the vehicle," to which Ronald responded, "I just smoked a cigarette."

44. The Defendant Officers continued to argue with Ronald about the reason for the stop until Donnelly finally stated, "We're not tripping, dude. It is what it is. Your car smells like weed. Have a nice day," and walked away.

45. Despite the Defendant Officers stating Ronald's car smelled like weed, and Vecchio stating "You can see the weed, man, in there," there was no indication that Ronald had any illegal substance, nor was any illegal substance seized.

46. Vecchio then said, "Alright man, the attention game's over, man, you're free to go, ok? You have a good day," and walked away.

47. As Rodriquez left, he remarked, "Nice try, though," and exclaimed, "Tact team, baby!"

48. Defendant Officers left the scene without initiating any charges or issuing a parking ticket.

49. Defendant Officers failed to provide a stop receipt as required by Chicago Police Department rules.

50. On information and belief, Defendant Officers failed to generate an Investigatory Stop Report as required by CPD rules.

## DEFENDANT OFFICERS' HISTORY OF MISCONDUCT

51. Since this incident, Defendants Vecchio and Donnelly have been relieved of their police powers due to multiple investigations into serious allegations of police misconduct.

52. Since this incident, Defendant Rodriquez has been recommended for reassignment and to undergo behavioral intervention.

53. Defendants Vecchio, Rodriquez, and Donnelly already have extensive histories of sustained allegations of misconduct.

54. Defendant Officers were all members of the 1863 tactical team, which has been the subject of numerous investigations by the Civilian Office of Police Accountability ("COPA").

55. In December 2024, COPA identified patterns of concern involving Defendant Officers and the 1863 tactical team. These included "unprofessional and disrespectful conduct towards civilians, including the use of profanities, insults, and threats of force"; "the use of pretextual traffic stops for reasons such as stopping too far away from the curb, stopping in a non-parking zone, and seatbelt violations,"; and "a consistent failure to adhere to CPD policies regarding the documentation and recording of civilian/police encounters, including failing to complete ISRs and TSSS cards, failing to provide ISR receipts, and late BWC activations.

56. In October 2025, COPA issued memoranda regarding Vecchio and Rodriquez, recommending that Vecchio be relieved of his police powers pending the resolution of COPA's investigations, and further requesting that the Chicago Police Department reevaluate Rodriquez's assignment as an 18th District tactical team officer. COPA also recommended that Rodriquez be screened for entry into CPD's Behavioral Intervention System.

57. COPA noted that despite having only six years of experience as a police officer, Vecchio has been named as an accused in at least 76 different complaints (also known as log numbers).

58. In fact, according to COPA, Vecchio has the highest number of log investigations in the entire Chicago Police Department.

59. COPA further noted that Vecchio's partner, Rodriquez, has the second-highest number of complaints in the CPD (67 log numbers), and that Donnelly has the fifth-highest number of complaints (42 log numbers).

60. The average Chicago Police Department member has 3.5 log numbers.

61. The majority of the complaints and investigations involve allegations of unjustified traffic stops, arrests, searches, and disrespectful or unprofessional conduct.

62. Additionally, COPA is investigating cases in which Vecchio allegedly provided false statements and/or testimony. Both incidents involved traffic stops during which Vecchio recovered a firearm during a vehicle search.

## LAWSUITS AGAINST DEFENDANT OFFICERS

63. Defendant Officers are no strangers to being accused of unlawful conduct similar to the conduct described in this complaint.

64. In *Wilson v. Vecchio* (24-cv-12371), Defendant Vecchio was accused of approaching the plaintiff's stopped car for a minor parking violation, unlawfully searching the plaintiff's vehicle, unlawfully detaining the plaintiff, using excessive force against the plaintiff, and denying the plaintiff equal protection.

65. The City settled *Wilson* for $80,000.

66. In *Northington v. Tohatan* (24-cv-11466), Defendant Vecchio, along with other officers from 1863, was accused of approaching the plaintiff's stopped car for a minor parking violation, pulling him out of his car, handcuffing and detaining him, searching his car, mocking insulting, and threatening him before walking away and authoring a falsified stop report.

67. The City settled *Northington* for $80,000.

68. In *Ipaye v. City of Chicago et al.* (24-cv-8958), Defendant Vecchio was accused of searching the plaintiff's vehicle and person without consent or probable cause.

69. The City settled *Ipaye* for $80,000.

70. In *Streeter v. Rodriquez et al.* (24-cv-04158), Defendant Rodriquez is accused of using excessive force during two encounters with the plaintiff, one during which he repeatedly and forcefully banged the plaintiff's face and head into his vehicle. Defendant Rodriquez and Defendant Donnelly are also accused of searching the plaintiff's vehicle and person without consent or probable cause during the second encounter.

71. The *Streeter* lawsuit remains pending.

72. In *Quinn v. Vecchio et al.* (25-cv-10782), Defendants Vecchio and Rodriquez are accused of searching the plaintiff's vehicle without consent or probable cause leading to plaintiff's false arrest. Vecchio is accused of falsifying reports and offering perjured testimony regarding the stop.

73. The *Quinn* lawsuit remains pending.

74. In *Garcia v. Vecchio et al.* (25-cv-13109), Defendant Vecchio is accused of unlawfully searching the plaintiff without reasonable suspicion or probable cause.

75. The *Garcia* lawsuit remains pending.

76. The cases cited above are just the tip of the iceberg when it comes to lawsuits against Chicago police, and specifically the 1863 tactical unit, for unlawful stops and searches.

77. The City has paid millions of dollars in settlements of lawsuits alleging unlawful traffic and investigatory stops and illegal searches.

78. As just one example, the City's Law Department recently agreed to pay the family of Dexter Reed $1.25 million to settle their lawsuit arising from an illegal, pretextual stop of Reed by Chicago police which resulted in the death of Reed and the wounding of an officer.

## DEFENDANT RODRIQUEZ'S DISCPLINARY HISTORY

79. Defendant Rodriquez has been disciplined for similar conduct in the past.

80. On February 1, 2024, the Chicago Police Department's Bureau of Internal Affairs ("BIA") sustained allegations against Defendant Rodriquez for verbal abuse/profanity and operation/personnel violations/neglect of duty during a traffic stop.

81. The BIA determined that Defendant Rodriquez verbally abused the reporting party by directing multiple profanities towards the reporting party and that he violated CPD Special Order S03-14: Body Worn Cameras by failing to record the entirety of the traffic stop.

82. The BIA recommended that Defendant Rodriquez receive a three-day suspension.

83. As a result of the foregoing, Ronald was deprived of rights secured by the Fourth Amendment to the United States Constitution and by the laws of the State of Illinois.

## PRAYER FOR RELIEF

For the foregoing reasons, the Plaintiff RONALD TURNER, prays for judgment against Defendants in a fair and reasonable amount, including compensatory and punitive damages, attorney fees and costs, and for any additional relief this Court deems just and proper.

## <u>JURY DEMAND</u>

The Plaintiff RONALD TURNER, requests a trial by jury.

**DATED:** October 31, 2025

Respectfully submitted,
RONALD TURNER

/s/ Jordan Marsh
*Attorney for the Plaintiff*

**LAW OFFICE OF JORDAN MARSH LLC**
33 North LaSalle Street Suite 2000
Chicago, IL 60602
(224) 220-9000
jordan@jmarshlaw.com